**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 25-CR-395 (AHA)** |
| **v.** | : | |
| **MARKUS HAM,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. This memorandum, together with such evidence as may be presented at the sentencing hearing and the government's allocution at the time of sentencing, is intended to outline to the Court relevant matters relating to what the government believes is an appropriate sentence in this case. To inform its allocution, the government has reviewed the application of the advisory Sentencing Guidelines; the Final Presentence Reports ("PSR") prepared by U.S. Probation Officer ("USPO") Ms. Candace Broughton, *see* PSR ECF #22 and USPO Ms. Broughton's sentencing recommendation, *see* ECF #23; the relevant factors set forth in 18 U.S.C. § 3553; and the defendant's plea of guilty in this case. Based on that thorough and comprehensive review, the government respectfully avers that this Court should sentence the defendant to the high-end sentence of the applicable guideline term of 63 months of incarceration followed by 36 months of Supervised Release.

## I. INTRODUCTION

On May 21, 2026, the defendant pled guilty to Count One of the Indictment charging Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by

Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(l).

## II. FACTUAL BACKGROUND

On December 11, 2025, at approximately 1:38 a.m., Officer Jose Hernandez was on patrol in full uniform, driving a marked scout car and using call sign 5OT32M. Officer Hernandez observed a White Ford Explorer bearing Virginia tag SZH-6318 stopped on the curb on the opposite side of the road facing northbound in the southbound lane. Officer Hernandez then approached the vehicle from the passenger side to make contact with Markus Ham ("HAM"), who was in a deep state of sleep behind the wheel of the vehicle. Officers then approached the vehicle from the driver's side and noticed HAM had a handgun between his legs. Officers then asked for additional units to assist and for the ballistic shield to be brought to the scene.

Once the assisting officers were on scene with the ballistic shield, the officers approached the vehicle and noticed that HAM was still asleep. At that time, Sergeant Gould went to the driver's window and reached into the vehicle and between HAM's legs to retrieve and secure the firearm. Once the handgun was secured, officers were able to open the door and placed HAM in handcuffs. HAM was identified by a Maryland Driver License as Markus Ham. Once HAM was in custody, a search of his vehicle was conducted. Ammunition was found in the center console between the driver and passenger seats. Specifically, HAM had eleven (11) rounds in a clear plastic bag that was recovered.

At the time of the recovery, the firearm was identified as a Ghost Gun Semi-automatic Polymer 80 pistol Model PF94DC with one (1) round of live ammunition in the chamber and fourteen (14) rounds of live ammunition inside the magazine that had a capacity for fifteen (15) rounds. *See* Figure 1 below:



*Figure 1*

At the time of recovery, the firearm appeared to be fully functional, designed to expel a projectile by means of an explosive action, had a barrel length of less than twelve inches, and was capable of being fired by the use of a single hand. RTTC Officer Joyce confirmed that the firearm was not registered in the District of Columbia. A Request for Certificate – No registration and/or License to Carry Form was submitted to check for a valid firearm registration or a conceal carry license. Results from that query revealed HAM was not in the D.C. gun registry. A law enforcement query confirmed that the firearm was not registered in the District and that HAM did not have a concealed carry permit. Also, HAM possessed the firearm and ammunition voluntarily and on purpose and not by mistake or accident. There are no firearms or ammunition manufacturers or distributors in the District of Columbia; therefore, the firearm and ammunition in this case necessarily traveled in interstate commerce before it was recovered on the defendant in the District of Columbia.

## III. SENTENCING CALCULATION

**Base Offense Level**

The guideline for 18 USC § 992(g)(1) offenses is found in USSG §2K2.1 of the guidelines. If the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense (to wit: Attempted Possession With Intent to Distribute PCP in 2017 CF2 018549), then the base offense level is 20. USSG §2K2.1(a)(4)(A). *See* Final PSR ECF #22 at ¶21.

Acceptance of Responsibility: USPO Ms. Broughton concluded that the defendant has clearly demonstrated acceptance of responsibility for the offense by pleading guilty. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). *Id.* ¶27. Moreover, the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b). *Id.* ¶28.

Based upon a total offense level of 17 and a criminal history category of VI, the guideline imprisonment range is 51 months to 63 months.[1] Consequently, the United States avers, that the defendant should be sentenced to a term of incarceration of 63 months' imprisonment to be followed by 36 months' Supervised Release.

**<u>UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES</u>**

Even though the Sentencing Guidelines are advisory, *United States v. Booker* provides that

[1] The Probation Office's calculations differ from the plea agreement estimations (*see* ECF #16). Specifically, the Probation Office did not include the four-level adjustment, pursuant to USSG §2K2.1(b)(4)(B)(ii), and calculated 13 criminal history points which resulted in a criminal history category of VI. The guideline imprisonment range for a total offense level of 17 and criminal history category of VI is 51 months to 63 months.' *Id.* ¶112.

sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated.") Moreover, the Guidelines' recommended sentencing range will ordinarily "'reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (*quoting Rita v. United States*, 551 U.S. 338, 347-50 (2007)); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation.

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment., backg'd. *Dorcely*, 454 F.3d at 375.

Notably, based on the facts of this matter and the defendant's long criminal history, are very significant and concerning – *see* Final PSRs ECF #22 – and the fact that the defendant was

on release status supervision for a violent conviction as noted more fully *infra* – all demonstrates that this Court should sentence the defendant to the high-end sentence of the applicable guideline term of 63 months of incarceration followed by 36 months of Supervised Release.

## IV. SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing defendant Ham.

### (1) The nature and circumstances of the offense and the history and characteristics of the defendant.

#### (A) The nature and circumstances of the offense

Here, the nature and circumstances of the offense counsel in favor of a significant term of imprisonment. The nature and circumstances surrounding the charged offense is very troubling. Indeed, the circumstances of the crime here involved the defendant, who was in a stopped vehicle in a deep state of sleep behind the wheel of a vehicle on a public street, in possession of a loaded firearm. Officers then approached the vehicle from the driver's side and noticed that the defendant had a loaded handgun between his legs. This illegal possession of a loaded firearm, combined with the defendant's prior convictions, is very alarming and poses a significant danger to our community.

It cannot be overstated that the possession of a loaded firearm by a convicted felon with defendant Ham's lengthy criminal history and numerous felony and firearm convictions is disturbing and extremely dangerous to our community. The increase of urban shootings and violent crimes involving firearms has shown the negative impact that the unregulated flow of firearms can have on a community. Thus, as a threshold matter, the defendant's possession of a loaded handgun in a vehicle on a public street placed the community at risk. *See e.g.*, *United*

*States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public): *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2-3 (D.D.C. Sept. 21, 2020) (making the same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a firearm "has the great potential to escalate into violence"). Judges of this Court have warned against discounting the inherent danger associated with loaded firearms. *See, e.g.*, *Blackson*, 2023 WL 1778194, at *7-8 (noting that the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"), *aff'd*, *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023); *see also United State v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020) (holding that a defendant should be detained pretrial in part because "the firearm recovered from the defendant's person had a round already chambered, making the circumstances even more troubling"), *aff'd* (D.D.C. Nov. 5, 2020). Here, the loaded firearm recovered in this case had many of these frightening characteristics because it was loaded with one round in the chamber and ready to fire.

Furthermore, the fact that the defendant, despite being unable to legally possess a firearm and being on a previously court ordered release status for his 2022 Maryland Accessory After the Fact Murder Second Degree conviction further shows that the defendant to obtain a loaded firearm in this case is very terrifying. In fact, the defendant could not have possessed the loaded firearm legally due to his status as a felon, and therefore, he must have had an illicit

source for the firearm, further demonstrating the potential dangerousness of this defendant. Accordingly, the government respectfully avers that the defendant is a significant danger to the community, and his criminal actions in this matter demonstrate that a high-end sentence of the applicable guideline term of 63 months of incarceration followed by 36 months of Supervised Release, is in the interests of justice and would punish the defendant appropriately.

**(B) The history and characteristics of the defendant**

The defendant is a 45-year-old man who has very significant and lengthy previous adult convictions as outlined in the PSR report. The government is particularly concerned about all of the defendant's numerous prior convictions outlined in his PSR; of note, the United States will highlight the following felony convictions more fully *infra*: 2023 Maryland Accessory After the Fact Murder Second Degree; 2020 Maryland Regulated Firearm: Illegal Possession; 2018 D.C. Superior Court Attempted Possession With Intent to Distribute PCP; 2013 D.C. Superior Court Assault on a Police Officer (Misd.) and Possession of a Firearm (Prior Conviction); and 2002 D.C. Superior Court Aggravated Assault. *See* Final PSR ECF 22 ¶¶43, 42, 41, 39, and 35.

According to the Application for Statement of Charges for the 2023 Maryland Accessory After the Fact Murder Second Degree conviction, on Thursday, May 5, 2022, at approximately 2259 hours, Prince George's County Police responded to the University of Maryland, Capital Region Medical Center (CRMC), located at 901 Harry S. Truman Drive, Upper Marlboro, Maryland, for a gunshot wound victim who was driven to the hospital. Upon arrival at the hospital, officers observed the decedent, Javon Rashad Washington, who had several defects to his head, torso, and right arm. Officers met with the surviving victim, who was known to the

police, who advised that she was operating a Mazda CX-5 while the decedent was the front passenger. While stopped at a traffic light at the intersection of Enterprise Road and Annapolis Road, Bowie, Maryland, an unknown black SUV approached and stopped at the passenger's side of her vehicle. Occupants inside the black SUV then fired multiple rounds into the vehicle striking the decedent, multiple times to the head, torso, and arm. The victim was not struck and drove the victim to CRMC where, despite all life-saving measures, the decedent was pronounced dead.

Video surveillance from D & S General Store located at 3505 Enterprise Road, Bowie, Maryland, showed the victim and the decedent utilizing the gas pumps while the defendant, Markus Ham, co-defendant Landon Robert Zackery, and a witness known to police exited a black Cadillac Escalade entered the store and made a purchase. As they exited the store, the witness approached the decedent at the gas pump, exchanged a handshake, and had a brief conversation before returning to Cadillac Escalade where Zackery and Ham were waiting. There was a verbal exchange between the occupants of the two vehicles.

The Cadillac Escalade, operated by co-defendant Zackery, stopped parallel to the Mazda. The co-defendant then began to have a brief conversation with the decedent through their open windows. The decedent, visibly agitated, exited the Mazda CX-5 during the verbal exchange. The Cadillac Escalade exited the lot and turned right onto Northbound Enterprise Road towards Annapolis Road. The victim then entered the driver's seat of the Mazda CX-5, and the decedent entered the front passenger seat of the vehicle. The Mazda CX-5 exited the lot and turned right onto northbound Enterprise Road towards Annapolis Road. On May 12, 2022, defendant Markus Ham was positively identified through a photo array. Further investigation determined that the defendant and co-defendant went back to the co-defendant's residence and switched

vehicles. Defendant Ham drove his Volkswagen Jetta back to the area of D & S General Store, followed the decedent, and commenced to shooting at the decedent's vehicle. The co-defendant advised the witness that "I shot up the vehicle but was unsure if I killed him and did not want to shoot the driver." The defendant participated in the murder of Javon Rashad Washington in Prince George's County, Maryland. *Id* ¶43.

According to the Statement of Probable Cause for the 2020 Maryland Regulated Firearm: Illegal Possession conviction, on February 3, 2019, officers on patrol in the area of Jamestown Road and Lancer Drive, Hyattsville, Maryland, observed a black Grand Marquis with illegal tinting material and an inoperable center stop lamp. Officers activated emergency lights and conducted a traffic stop. Officers made contact with the driver/defendant, Markus Octavious Ham, and the passenger, Katherine Hawkins-Robinson, when officers observed in plain view a handgun on the floor board of the passenger side of the vehicle. The defendant and passenger were asked to step out of the vehicle. A search of the passenger's person yielded less than one gram of suspected marijuana in the center of her bra. A search of the vehicle yielded a glass vial containing 1.129 ounces of suspected Phencyclidine, which had a street value of $300, in a clear rubber glove. The Maryland Gun Center was notified and advised the defendant was prohibited from possessing a firearm. *Id* ¶42.

According to the Gerstein Affidavit for the 2018 D.C. Superior Court Attempted Possession With Intent to Distribute PCP conviction, on October 30, 2017, at 2919 7th Street NE, Washington, DC, officers responded for a traffic accident with the occupant of the vehicle "passed out" behind the wheel. Once the driver of the vehicle was awakened, he was asked to exit the vehicle through the passenger side door because the driver's side door was unable to

open. As the driver exited the vehicle, officers saw a clear plastic container with a blue plastic lid, that contained a clear vial, and what appeared to be a dropper which is commonly used with the sale of PCP. Once out of the vehicle, the driver was identified as Markus Octavious Ham (DOB: --/--/----). A search of the vehicle recovered a pouch consisting of 3 vials with dark colored liquid, 10 medical gloves, a clear glass vial that was empty, 3 more clear glass vials, and a 50 smaller glass vials. During a search incident to arrest of Mr. Ham, officers recovered a clear zip containing 14 clear capsules with white powder inside, $60, and a cigarette box of 15 cigarettes. The clear capsules field tested positive for MDMA. *Id* ¶41.

According to the Gerstein Affidavit for the 2013 D.C. Superior Court Assault on a Police Officer (Misd.) and Possession of a Firearm (Prior Conviction) conviction, on December 7, 2012, officers on patrol were traveling eastbound in the 2500 block of 14th Street NE, Washington, DC when they observed two individuals walking together from the rear of 1319 Rhode Island Avenue NE, appearing to hold each other up. One of the males was identified as Mr. Markus Hamm. Mr. Hamm has his right arm draped over the second man. As Mr. Hamm was standing with this second male, he reached toward his waistband with his left hand, grabbed an object through his shirt, and adjusted it. Officers passed in front of Mr. Hamm and stopped. Mr. Hamm separated from the second male and walked towards a white Cadillac on the south side of the street. Mr. Hamm attempted to enter the front passenger door of the vehicle, but the door was locked and he was unsuccessful. Officers approached the defendant who was standing alone and stumbling. Officers grabbed the defendant's arm and immediately felt a hard object in Mr. Hamm's waistband. The defendant adjusted the object underneath his shirt, which officers believed to be a firearm. Officers said "gun" and tried to place Mr. Hamm in handcuffs, which

he actively resisted and continuously tried to regain control of his arms. The firearm was recovered and the weapon was determined to be a Ruger P90,.45 Caliber, serial #662-17573, with the hammer cocked to the rear and ready to be fired. Contained in the chamber of the weapon was one .45 caliber cartridge (bullet) and within the magazine was an additional five .45 caliber cartridges (bullets). Recovered from Mr. Hamm was two bullets and a 200 ml bottle of Remy Martin liquor. *Id* ¶39.

According to the Indictment for the 2002 D.C. Superior Court Aggravated Assault conviction, on September 29, 2001, the defendant, Sherod Hutcherson, and Charles Lyons willfully combined or conspired to assault and rob N.W. Defendant Ham punched N.W. in the face with his fist, causing him to lose consciousness. They ordered persons accompanying N.W. to leave the area and leave N.W. with them. They repeatedly kicked N.W. with their feet while N.W. was unconscious. They searched N.W.'s pockets to take his personal property. They caused serious bodily injury to N.W. while armed with a shod foot. *Id* ¶35.

More broadly, the defendant's prior periods of incarceration and supervision have done little to deter the defendant's criminal behavior. He has had his supervision revoked, on numerous occasions. For example, the defendant's 2020 Maryland Regulated Firearm: Illegal Possession, the supervision officer requested the U.S. Parole Commission to issue a warrant for violating the following conditions: Obey all laws, not possess a weapon or firearm, not present a danger to yourself or others, pay monthly supervision fee, and undergo drug and alcohol testing. *Id* ¶42. In a further review of the defendant's prior convictions outlined in his PSR, it shows that the defendant violated the conditions of his release on most of those cases. *See id* ¶¶35, 37, 38, 42, and 43. Nevertheless, the defendant has had ample opportunities and court

supervisions that provided him with the resources to rehabilitate himself and contribute to our community. Sadly, the defendant has chosen not to do so. On the contrary, he has repeatedly chosen to disregard the court's directives and terms of supervision and instead persisted in criminal conduct that has culminated in his conviction for the instant matter. This pattern of persistent criminal conduct which started in 2001 and continued until his arrest in this case with 13 adult convictions (*see* PSR ¶¶32-44) and many other arrests (*see* PSR ¶¶50-61), coupled with his disregard for the terms of supervision, necessitates a top of the Guidelines sentence.

In making its current sentencing recommendation to the Court, the government has also reviewed the defendant's Personal and Family Data as outlined in the Final PSR, which described the defendant's relationship with his family and family history. *See id*. ¶¶64-72. USPO Ms. Broughton found, *inter alia*, that the defendant recalled growing up was "tough". *Id*. at ¶69. Finally, the defendant's Substance Abuse backgrounds as outlined in his PSR, reveal the defendant has a history of struggling with substance abuse. *Id*. ¶¶85-90. Notably, regarding his substance abuse, USPO Ms. Broughton found that, the defendant reported using PCP, marijuana, alcohol, and MDMA. *Id.*¶69. In fact, the defendant reported in the 2018 PSR that he began drinking beer at age 11 or 12 and he began drinking hard liquor in 1995, while in high school. He noted he used to suffer from "blackouts" during use. He previously stated: *"I got a mean alcohol problem. I would buy I fifth or pint of 1738 (Remy Martin Cognac) and you would think it would last two days, but I would go through a fifth in a night. I would drink a pint like it's Gatorade." When asked why he was consuming alcohol so excessively, Mr. Ham stated "Drowning out my misery. Everything we do is for a reason. I used to black out my thoughts. I never liked myself. I never liked my upbringing. I was always a heavy drinker and it messed up*

*my goals. Alcohol always messes up everything. Alcohol is a gateway drug and it's true and I know for a fact. It opens up the door for what you want. I can go weeks without smoking, but let me be drunk and I always blackout. People take money out my pockets. Alcohol takes away all inhibitions. You just free with everybody. I always go overboard. I don't know my limit. I drink until I can't stand up. I don't think I'm bad drunk. I'm not a violent drunk or maybe I am. I done assaulted a police officer." Id.* ¶89.

**(C) The Need to Afford Adequate Deterrence to Criminal Conduct, and the Need to Protect the Public from Further Crimes of Defendant**

The Court must also consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct [and] to protect the public from further crimes of the defendant . . . ." 18 U.S.C. § 3553(a)(2)(B), (D). Importantly, this Court is well aware of the impact that loaded firearms have had on the District of Columbia, and the need to deter that conduct. A sentence that provides both specific and general deterrence is especially important in this case because the defendant possessed a loaded firearm while sleep in a vehicle on a public street in our community. If our community is to have any hope of stemming the tide of illegal loaded firearms to prevent any more tragedies in our community, the defendant must be punished accordingly.

Simply put, this pattern of persistent criminal conduct by this defendant, his possession of a loaded firearm in this case, and coupled with his disregard for the terms of supervision in his previous conviction (*see id.* ¶43), necessitates a top of the Guidelines sentence. Indeed, a lengthy sentence in this case will serve as a specific deterrence for this defendant and will make clear to him that the repeated recidivism will only result in harsher sentences, and a lengthy sentence of this defendant by this Court offers general deterrence to others by demonstrating to the community that repeated crimes or possession of illegal loaded firearm will not be tolerated.

**(D) The need to avoid unwarranted sentencing disparities among defendants with similar records**

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. As discussed *supra*, this Court should sentence the defendant to a high-end sentence of the applicable guideline term of 63 months of incarceration followed by 36 months of Supervised Release. Indeed, the government's requested sentence is reasonable, as it strikes the balance between considering the defendant's background and the facts of this case.

Specifically, the government's recommendation takes into account the additional fact that, at the time of the instant offense, the defendant was on supervision for his 2023 Accessory After the Fact Murder Second Degree conviction. Despite being given multiple opportunities by other judicial officers in his numerous prior convictions to not commit any additional criminal offenses, the defendant continued to reoffend and, in the instant cases, acquired a loaded firearm where citizens lived nearby. These facts demonstrates that the defendant was ready, willing, and able to commit another crime against members of the community. *See United States v. Blackson*, 2023

WL 1778914, at *11 ("At the outset, it cannot be gainsaid that unlawful possession of a firearm that is unregistered and fully loaded, with extended capacity magazines, carried in a position of easy, quick access poses a significant danger to other persons and the community."); *United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) ("[P]ossession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public."). Thus, the defendant's dangerousness cannot be overstated, and he should be sentenced at the high-end of the Guidelines range for all the reasons stated herein.

## V. CONCLUSION

For the foregoing reasons, the United States recommends that this Court sentence defendant Ham to a high-end sentence of the applicable guideline term of 63 months of incarceration followed by 36 months of Supervised Release is appropriate. Thus, the government respectfully advances that its recommended sentence would therefore reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: */s/ Emory V. Cole*
EMORY V. COLE
PA. Bar No. 49136
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Emory.Cole@usdoj.gov